# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

MELISSA A. GALLOWAY,

        Claimant,

vs.

KILOLO KIJAKAZI,
ACTING COMMISSIONER OF
SOCIAL SECURITY,[1]

        Defendant.

CIVIL ACTION NO. 20-CV-00059-CJW

**REPORT AND
RECOMMENDATION**

_____

     Melissa A. Galloway ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") in denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34.  Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled.  For the reasons that follow, I recommend that the Commissioner's decision be **affirmed**.

## I.  BACKGROUND

     I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 15) and only summarize the pertinent facts here.  Claimant was born on January 27, 1968.  (AR at 207.)  Claimant has at least a high school education and is able to communicate in English.  (*Id.* at 25.)  Claimant allegedly became disabled due to major depressive

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner Kilolo Kijakazi is substituted for Commissioner Andrew M. Saul as the defendant in this suit.

1

disorder, anxiety disorder, psoriasis, carpel tunnel syndrome, hand and joint pain, right arm neuropathy, lower back pain, and a herniated disc. (*Id.* at 229.) Claimant's original onset of disability date was August 3, 2016, which she amended at her hearing to February 27, 2017. (*Id.* at 15, 207.) Her claim was originally denied on July 5, 2017. (*Id.* at 133-36.) Her claim was denied on reconsideration on January 5, 2018. (*Id.* at 142-46.) A video hearing was held on May 9, 2019, with Claimant and her attorney, Daniel Yates, in Marshalltown, Iowa, and ALJ Julie Bruntz presiding from West Des Moines, Iowa. (*Id.* at 55-78.) Vocational expert ("VE") Melinda Stahr also appeared at the hearing. (*Id.*) The Claimant and the VE both testified. (*Id.* at 58-78.) The ALJ issued an unfavorable decision on July 1, 2019. (*Id.* at 15-26.)

Claimant requested review and the Appeals Council denied review on April 1, 2020. (*Id.* at 1-5.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. See 20 C.F.R. § 416.1481.

On June 10, 2020, Claimant timely filed her complaint in this Court. (Doc. 4.) On, March 30, 2021, briefing deadlines expired, and the Honorable C.J. Williams referred the case to me for a Report and Recommendation.

## II. DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant

2

numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137,

141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include the following abilities:

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to this application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

4

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id*. §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.    *The ALJ's Findings*

The ALJ first determined that Claimant's date last insured was September 30, 2017. (AR at 17.) The ALJ then made the following findings at each step of the five-step process regarding Claimant's disability status. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity from her alleged onset date of February 27, 2017 through her last date insured of September 30, 2017. (*Id*.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: spine disorder, depression, anxiety, carpal tunnel syndrome, and psoriatic arthritis. (*Id*.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations. (*Id*.)

The ALJ evaluated Claimant's mental health claims under listing 12.04 (depressive, bipolar, and related disorders) and listing 12.06 (anxiety and obsessive-compulsive disorders). (*Id*. at 18.)

At step four, the ALJ found that Claimant had the following RFC:

[T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: her ability to push and pull, including the operation of hand and foot controls, would be frequent within these weights; can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch,

5

and crawl; individual is right hand dominant and can frequently reach overhead on the right [h]and no limitation on the left; can frequently handle and finger bilaterally; needs to avoid concentrated exposure to extreme cold; avoid concentrated exposure to hazards such as heights and dangerous machinery, as well as fumes, gases, poor ventilation, and dust; limited to jobs where she can understand, remember, and appropriately carry out simple instructions; use judgement in making simple work related decisions; deal with changes in a routine work setting; can have occasional contact with the public, co-workers, and supervisors; and would need to avoid walking on grossly uneven ground.

(*Id.*)  The ALJ also found that Claimant was not capable of performing her past relevant work.  (*Id.* at 24.)

At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy Claimant could perform, including assembler, hand package inspector, and mail sorter.  (*Id.* at 25-26.)  The ALJ thus concluded that Claimant was not disabled.  (*Id.* at 26.)

**B.**    ***The Substantial Evidence Standard***

ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole."  *Moore*, 572 F.3d at 522.  "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted).  Thus, a court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case.  *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted).  The decision is not outside that zone of choice simply because the court might have reached a different decision.  *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that

the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III.   DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to properly weigh certain medical source opinions; (B) failing to provide good reasons for her evaluation of Claimant's subjective complaints; (C) failing to fully and fairly develop the record concerning her physical and mental limitations; and (D) failing to proffer a hypothetical question at step five that included all Claimant's limitations, which led to a denial of benefits that was not supported by substantial evidence.

### A.   Whether the ALJ Properly Weighed the Opinion Evidence

Claimant takes issue with the weight the ALJ assigned to the opinions of her treating psychologist, therapist, and psychiatric medication manager. (Doc. 16 at 11.) Specifically, Claimant argues that "the ALJ did not provide good reasons for the weight assigned to opinions by Dr. Amanda Johnson, Ph.D., and opinions by Ed Rund, LISW,[2]

---

[2] "LISW" is an abbreviation for "Licensed Independent Social Worker."

and Lisa Rock, ARNP,"[3] who submitted a joint opinion. (*Id.* at 13.) Under the rules applicable at the time Claimant applied for benefits, Dr. Johnson was an "acceptable medical source" and Mr. Rund and Ms. Rock were "other medical sources." (*Id.* at 13-14.)[4]

### 1. *Opinion of Dr. Amanda Johnson*

On May 8, 2019, Dr. Johnson completed a standard check-box, fill-in-the-blank, short-answer "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." (AR at 848-50.) Dr. Johnson checked boxes indicating that Claimant suffered moderate limitations in the following work-related mental activities: understanding and remembering short, simple instructions; carrying out short, simple instructions; understanding and remembering detailed instructions; carrying out detailed instructions; the ability to make judgements on simple work-related decisions; the ability to interact appropriately with the public; the ability to respond appropriately to work pressures in a usual work setting; and the ability to respond appropriately to changes in a routine work setting. (*Id.* at 848-49.) Dr. Johnson also checked boxes indicating that Claimant had mild limitations in her abilities to interact appropriately with supervisors and interact appropriately with coworkers. (*Id.* at 849.) Dr. Johnson noted that these opinions were based on her "[c]linical observation during exacerbations of symptoms of depression and generalized anxiety." (*Id.* at 848.) Dr. Johnson also stated that "Ms. Galloways [sic] symptoms vary greatly day to day and the . . . assessment is an average." (*Id.* at 849.)

The ALJ acknowledged Dr. Johnson's status as a treatment provider for Claimant, but assigned "little weight" to the formal opinion "because of timeliness," noting that the opinion form was not completed until around a year and a half after Claimant's last date

---

[3] "ARNP" is an abbreviation for "Advanced Registered Nurse Practitioner."
[4] Claimant notes that under the current regulatory regime, Ms. Rock would also be considered an acceptable medical source. (Doc. 16 at 14 n.6 (citing 20 C.F.R. § 404.1502(a)(7).)

insured ("LDI"). (*Id.* at 23.) The ALJ also opined that "little weight [was] given because [Dr.] Johnson's form mainly consist[ed] of checkmarks and she provide[d] very little reasoning for her opinion and cite[d] no objective evidence to support her opinion." (*Id.*)

### a. Claimant's Arguments

Claimant argues that the ALJ improperly assigned Dr. Johnson's opinions too little weight. Claimant contends that contrary to the ALJ's opinion, Dr. Johnson "provided explanations for her opinions and did not just provide checkbox answers." (Doc. 16 at 14 (citing AR at 849-50).) Claimant also asserts the following:

> Concerning Dr. Johnson's opinions coming after the date last insured, Dr. Johnson's treatment of Ms. Galloway began in December 2017, approximately two months after her date last insured. (See TR 17, 742) (date last insured was September 30, 2017 and Dr. Johnson's first record with Ms. Galloway is dated December 5, 2017). Dr. Johnson's opinions were based on Ms. Galloway's functioning on average, during her time treating Ms. Galloway meaning, the opinions related to Ms. Galloway's functioning going back to at least December of 2017 and just two months after Ms. Galloway's date last insured.

(*Id.*)

Claimant also argues that "there is no categorical rule in the Eighth Circuit that states opinions provided after the date last insured can just be thrown away without otherwise providing some other good reason for doing so." (Doc. 18 at 6 (citing *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) ("Our court has reached different conclusions about whether medical evidence concerning a claimant's condition at a later time is probative of her condition during the period of insured status. *Compare Rehder v. Apfel,* 205 F.3d 1056, 1061 (8th Cir. 2000) (concluding that a report by a non-treating psychologist, completed fourteen months after the relevant time period, is not probative of the claimant's condition during the relevant period) *with Basinger v. Heckler,* 725 F.2d 1166, 1169 (8th Cir. 1984) ("medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear

upon the severity of the claimant's condition before the expiration of his or her insured status")).)

### b.    Legal Standard for Evaluating Dr. Johnson's Opinion

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)). An ALJ must "give good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). "A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record as a whole.[5] *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quotation omitted). "Even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (citation and brackets omitted). However, a treating physician's opinion can be given limited weight if it contains only conclusory statements, contains inconsistent opinions "that undermine the credibility of such opinions," is inconsistent with the record, or if other medical opinions are supported by "better or more thorough medical evidence." *Id.* (citations omitted). A treating physician's statement that is "not supported by diagnoses based on objective evidence" will not support a finding of disability. *Edwards v. Barnhart,* 314 F.3d 964, 967 (8th Cir. 2003) (citing *Bates v. Chater,* 54 F.3d 529, 532 (8th Cir. 1995)). If the

---

[5] Under current regulations, a treating physician's opinion is entitled to no special deference. *See* 20 C.F.R. § 404.1520c(c). These regulations are effective for claims filed on or after March 27, 2017. *See* 20 C.F.R. § 404.1527. However, Claimant's claims were filed on February 27, 2017. Thus, the old regulations apply. *See id.*

opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." *Id.* (citation omitted).

When a treating physician's medical opinion is not given controlling weight, the following factors will be examined to determine the weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(c)(2).

### c. Analysis

A generous reading of Claimant's arguments is that she is making a supportability argument. "The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937. In addition, "'[t]he checklist format, generality, and incompleteness of [an] assessment[] limit [an] assessment's evidentiary value.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted)); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."); *see also Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) ("[Dr. Hollis's] assessments, however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value. On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying more heavily on other opinions in the record.") (internal quotations and citations omitted). Therefore, a treating source's opinion can be given limited weight if it contains

only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions." *Papesh*, 786 F.3d at 1132 (quotation omitted).

First, I agree with the ALJ that Dr. Johnson provided "very little reasoning for her opinion and cited to no objective evidence to support her opinion." (AR at 24.) "Clinical observations during exacerbations of symptoms of depression and generalized anxiety" (*Id.* at 84) is an unhelpful (and almost tautological) explanation, at best. In other words, the note suggests merely that Claimant is depressed and anxious because she is observed to be depressed and anxious. Dr. Johnson's explanation also undermines the strength of her opinion because there is no reference to how often these exacerbations occur. Dr. Johnson neither included concrete examples nor directed the reader to treatment notes that supported the opinion. Additionally, without some objective evidence to refer to, Dr. Johnson's reference to Claimant's varying symptoms is also not grounded in objective evidence. Thus, as the Commissioner notes, the ALJ was not free to "rely on [her] own inferences when weighing the available opinion evidence." (Doc. 17 at 18 (citing Claimant's argument).)

Second, even assuming that Dr. Johnson meant to rely on her treatment notes, the notes document very few abnormal findings. (*Id.* at 742-44, 818, 824-44.) Dr. Johnson began seeing Claimant in December of 2017, two months after Claimant's LDI. (*Id.* at 742-44.) Claimant was on time, appropriately dressed and groomed, alert, oriented to time, place, and person, had no readily apparent attention or concentration difficulties, and her memory was commensurate with her intellect. (*Id.* at 742.) Dr. Johnson administered the Minnesota Multiphasic Personality Inventory-2, after which she diagnosed Claimant with major depressive disorder, recurrent moderate and generalized anxiety disorder. (*Id.* at 742-44.)

Claimant next met with Dr. Johnson in May 2018, after Claimant had initially begun therapy with another therapist, and saw Dr. Johnson approximately every two

weeks thereafter. (*Id.* at 824-44.) Although Claimant was sometimes tearful during sessions due to situational stressors such as family dynamics, worries about her children, financial problems, and pain from psoriatic arthritis, her mental status examinations were always normal. (*Id.*) Situational stressors cannot provide the basis for a disability finding. *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010); *Dunahoo v. Apfel*, 241 F.3d 1033, 1040 (8th Cir. 2001). Dr. Johnson stated that Claimant was always appropriately dressed; alert; behaved appropriately; was oriented to time, person, and place; and had normal eye contact, affect, memory, speech, concentration, impulse control, judgment, movement, and insight. (AR at 824-44.) Dr. Johnson's opinion that Claimant had moderate limitations in understanding and remembering simple instructions conflicted with these mental status examination findings. *See Hacker*, 459 F.3d at 937. In fact, although Claimant mentioned depression and pain, she never mentioned problems with concentration, memory, dealing with the public, or changes in routine. (AR at 824-44.)

In addition, while an ALJ may not just "throw away" an opinion written after a claimant's LDI without providing good reasons for doing so, the above discussion shows that ALJ Bruntz provided good reasons for giving Dr. Johnson's opinion little weight, in spite of the opinion not only being written after Claimant's LDI, but also being written by a provider who did not even treat Claimant during the relevant time period. Therefore, I recommend affirming the ALJ's decision on this issue.

### 2. *Opinion of Ed Rund, LISW and Lisa Rock, APRN*

On October 16, 2017, Mr. Rund and Ms. Rock (collectively "the Providers") completed the same opinion form that Dr. Johnson completed. (*Id.* at 737-39.) The Providers agreed on the check mark evaluations and each wrote separate comments. (*Id.* at 737-38.)

13

They opined that the claimant had the following marked limitations: in understanding, remembering, and carrying out detailed instructions and responding appropriately to work pressures in a usual work setting. They further opined that the claimant had moderate limitations in understanding and remembering short, simple instructions . . . and the ability to make judgments on simple work related decisions. They opined that the claimant had . . . mild limitations in carrying out simple instructions.

(*Id.* at 22; 737-38.)   In addition, the Providers opined that Claimant had moderate limitations in her abilities to interact appropriately with the public, supervisors, and coworkers.  (*Id.* at 738-39.)

The ALJ gave the opinion "only partial weight because it is partially consistent with the longitudinal evidence of record." (*Id.* at 23.)  The ALJ found that the opinion did not deserve more weight because it consisted mostly of checkmarks, the Providers "provided little explanations for their markings," and they did not cite objective medical findings to support the opinion.  The ALJ further found that "the opinion that the claimant has marked findings in understanding and remembering detailed instructions and carrying out detailed instructions is not necessarily pertinent because the claimant is limited to simple, unskilled work. The record does not support a marked finding in the claimant's ability to respond appropriately to work pressures in a usual work setting." (*Id.*)

### a.    *The Parties' Arguments*

Claimant argues that the ALJ did not provide good reasons for assigning this opinion partial weight.  (Doc. 16 at 15.)   Specifically, Claimant asserts that "the [P]roviders provided detailed explanations for their opinions the ALJ did not discuss or address in the hearing decision." (*Id.*)  Claimant also notes that although the ALJ stated that the Providers did support their conclusions with objective findings, they explained that during appointments, they noticed Claimant "needs to write down instructions given to her," and that Claimant "had difficulty with focus and attention." (*Id.* (citing AR at 737).)  Claimant further asserts that the ALJ's rejection of the part of the opinion stating

14

that Claimant would have marked difficulties in an ability to respond appropriately to work pressures in a usual work setting by merely stating the record does not support the finding is insufficient under *Lucus v. Saul*, 960 F.3d 1066 (8th Cir. 2020). (Doc. 16 at 15.)

The Commissioner responds that although Mr. Rund based his opinion on Claimant's need to take notes during sessions and feeling overwhelmed when stressed, his treatment notes often mention appropriate eye contact, average intelligence, and intact memory. (Doc. 17 at 14 (citing AR at 457-64, 470-75, 481-83, 488-93, 498-99, 505-06, 558-59, 565-67, 572-84, 594-600, 606-12).) The Commissioner also notes that while Ms. Rock noted Claimant's difficulty with focus and concentration during appointments and complained that she had problems completing tasks at home, Ms. Rock observed several times that Claimant appeared not easily distracted or only mildly distracted and could "concentrate fully when [she] wanted with only slight difficulty." (*Id.* (citing AR at 437-38, 468, 479, 496, 503, 563, 570, 588, 592, 604).) As the Commissioner noted, the ALJ cited this statement in her opinion. (AR at 21.)

### b. Legal Standard for Evaluating The Providers' Opinion

Under relevant law, Ms. Rock, an advanced registered nurse practitioner, is a "medical source[] who [is] not [an] 'acceptable medical source[].'" SSR 06-03p, 2006 WL 2329939, at *2. Mr. Rund is a licensed independent social worker.

> A Licensed Independent Social Worker is not an "Acceptable medical source["] as defined by 20 C.F.R. § 404.1502(a)(1-8). However, such an individual is a "Nonmedical source" defined as "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law." *Id.* at (d). In Iowa, LISWs are licensed by the Iowa Board of Social Work. Iowa Admin. Code r. 282-16.6(2)(b). To be licensed, an applicant must hold a Master or Doctorate of Social Work degree from an accredited university or college, and must provide verification of at least 4000 hours of clinical professional experience under an approved supervision plan to apply for [the] LCSW

title. The applicant must have performed diagnosis, assessment and treatment over a minimum of two years and no more than six years of professional employment. The applicant must also have at least 110 hours of supervision during a two-year period with no more than sixty of those hours with groups who must be six or less in size. *See* https://www.humanservicesedu.org/iowa-social-work-requirments.html (last visited March 30, 2020).

*Anzivino v. Saul*, -- F.3d --, No. 4:19-CV-239 RP-CFB, 2020 WL 1540654, at *9 n.2 (S.D. Iowa Mar. 31, 2020). In the end, the distinction between a medical source who is not an acceptable medical source and a non-medical source makes no practical difference because the analysis of the opinion of a non-medical source must be conducted under the same rules as medical sources who are not acceptable medical sources, i.e., all such opinion evidence is considered evidence from "other sources." SSR 06-03p, at *4.

Although the five factors enumerated in 20 C.F.R. 404.1527(d) and 416.927(d) apply exclusively to the evaluation of medical opinions from "acceptable medical sources," the same factors can be applied to opinions of "other sources." *Id.* These factors include the following:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
- Any other factors that tend to support or refute the opinion.

*Id.* at *4-5. Furthermore, "In determining what weight to give 'other medical [source] evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Peterson v. Colvin*, No. C14-4110-LTS, 2016 WL 1611480, at *6 (N.D. Iowa Apr. 21, 2016) (quoting *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005)).

An ALJ is required to consider other sources, but may discount these sources if such evidence is inconsistent with the evidence in the record. *Lawson v. Colvin*, 807 F.3d 962, 967 (8th Cir. 2015) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 886-87 (8th Cir. 2006); *Raney*, 396 F.3d at 1010). The ALJ is required to explain the "weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-3p.

*Id.*; *see also Gulick v. Colvin*, No. C13-4038-MWB, 2014 WL 197727, at *11 (N.D. Iowa Jan. 17, 2014) (quoting SSR 06-3p), *R. & R. adopted*, 2014 WL 941730 (N.D. Iowa Mar. 11, 2014). Therefore, I must determine if the opinions are consistent with other evidence in the record and whether the ALJ's decision allows me to follow his reasoning. I will also consider whether the Providers' opinions are supported by their own treatment notes.

### c.    Analysis

Claimant's arguments raise two issues. First, whether the ALJ's opinion regarding the lack of objective evidence in support for the opinion is supported by the record as a whole. For this issue, Claimant focuses only on the first part of the opinion and the following statements made by the Providers: that Claimant "needs to write down instructions given to her" and that she has "difficulty with focus and concentration." (Doc. 16 at 18.)[6] Second, Claimant argues that the ALJ did not comply with *Lucus*, 960 F.3d 1066 when deciding the part of the opinion stating that Claimant would have marked difficulties in her ability to respond appropriately to work pressures in a usual work setting. According to Claimant, if the ALJ had not made errors evaluating this evidence,

---

[6] Claimant does not rely on any other comments made by the Providers to support this argument, presumably because the most relevant other comment is the focus of a separate argument. Therefore, I focus my analysis on these two comments.

17

the ALJ may have included more limitations in the RFC that would have precluded not only the jobs relied on to deny her benefits, but also other work in the national economy. (*Id.* at 15.)

> ### i. Whether the ALJ's Opinion Regarding the Lack of Objective Support for the Opinion that Claimant had Marked Limitations in her Abilities to Understand and Remember Detailed Instructions and Carry out Detailed Instructions and Moderate Limitations in her Abilities to Understand and Remember Short, Simple Instructions and Make Judgments on Simple Work-related Decisions is Supported by the Record

The ALJ concluded that the opinion was inconsistent with the longitudinal evidence. I will first examine whether the Providers' opinion was supported by their own treatment notes.

As discussed above, Mr. Rund stated that he based his opinion that Claimant had marked limitations in her abilities to understand, remember, and carry out detailed instructions and moderate limitations in her abilities to understand and remember short, simple instructions and make judgments on simple work-related decisions on Claimant's need to write down instructions he gives her during sessions. (AR at 737.) There is no indication anywhere in Mr. Rund's treatment notes that Claimant wrote things down during her appointments with Mr. Rund. However, I have no reason to doubt that Claimant took notes during her sessions with Mr. Rund. That being said, Mr. Rund's treatment notes do not support a finding that Claimant cannot understand instructions or make simple work-related decisions. While Claimant often said she felt like she had a diminished capacity to concentrate or that she was forgetful or unable to focus during the relevant time period, Mr. Rund consistently found Claimant's concentration to be intact and Claimant able to remain on topic during discussions at those same sessions. (*Id.* at 498-99, 505-06, 558-59, 575, 577, 583, 594, 599, 606-07, 611.)

Ms. Rock, whom Claimant saw during the relevant time period for medication management, stated that she supported the conclusions regarding Claimant's limitations in remembering instructions and making work-related decisions on Claimant's "difficulty with focus and concentration evident during appointments." (*Id.* at 737.) However, as the ALJ stated, Ms. Rock noted that Claimant "could 'concentrate fully when [she] wanted with slight difficulty. Not easily distracted.'" (*Id.* at 21 (citing AR at 570); *see also* AR 496, 503, 563, 592, 604 (same).) Although Ms. Rock's treatment notes acknowledge a "history of racing thoughts, excessive worry and being unable to get anything done[;] Frequently restless and on edge, with mind going blank from time to time[;] [and] Anxiety and worry about her situation and circumstances" (*Id.* at 494, 501, 561, 568, 586, 590, 602), as the ALJ noted, they also acknowledge that these symptoms improved when Claimant started taking Effexor. (*Id.* at 21, 494, 501, 561, 568, 586, 590, 602.) An impairment that is managed with treatment or medication is not considered disabling. *Brace v. Astrue*, 578 F.3d. 882, 885 (8th Cir. 2009) (citations omitted). In addition, as the ALJ noted, there is evidence in the Providers' treatment notes that Claimant "has not been entirely compliant in taking prescribed medications, which suggested that symptoms may not have been as limiting as the claimant has alleged in connection with this application." (AR at 21 (citing AR at 565 (Mr. Rund's treatment note).) Ms. Rock also noted a lack of compliance with medications, which affected Claimant's mood. (*Id.* at 561, 586, 590, 602.) In addition, although Claimant complained to Ms. Rock about sleep difficulties, stating that she had difficulty sleeping for days and then would crash from exhaustion, as the ALJ noted, Claimant also admitted that she slept better when she remembered to take her mirtazapine. (*Id.* at 21 (citing (AR at 501 (Dr. Rock's treatment note); *see also* AR at 561, 568 (same).) "Failure to follow a prescribed course of remedial treatment without good reason is grounds for

denying an application for benefits." *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (quoting *Roth v. Shalala,* 45 F.3d 279, 282 (8th Cir. 1995)).

Moreover, as the ALJ noted, although Claimant had some pervasive death wish when she was voluntarily in inpatient behavioral health treatment, she admitted that "she will make suicidal statement[s] if that is what it takes to get her inpatient treatment." (AR at 21 (citing AR at 688-90).) The ALJ noted that Claimant's death wish went away during her inpatient stay. (*Id.* (citing AR at 689).) Claimant's discharge notes indicate that during her stay, Claimant tolerated medication modifications well and she was "observed . . . smiling, laughing, and joking and she was interacting appropriately with peers and staff." (*Id.*) In June 2017, Dr. Bergman, who performed a consultative examination of Claimant, stated that Claimant had "a very good showing" on her mental status examination, scoring 29/30. (*Id.* at 511.) Dr. Bergman also noted that Claimant's limitations were tied to her physical problems and that when he asked Claimant if she would still be working if her physical problems were resolved, Claimant said "that she would be working, without equivocation." (*Id.* at 514.)[7]

On June 30, 2017, state agency consulting psychologist Mark Becker, Ph.D., reviewed the record and concluded that Claimant's mental health impairments were non-severe. (*Id.* at 84-85.) On reconsideration, on January 11, 2018, after Claimant's LDI, Jonathan Brandon, Ph.D., noted that Claimant "made no further allegations of limitations. [Activities of daily living] from the initial application and those submitted at reconsideration are generally consistent. The claimant continues to report some difficulty with stress and changes in routine, as well as concentration and memory, and mental limitations appear to be secondary to physical problems." (*Id.* at 111.) Dr. Brandon

---

[7] The ALJ did not evaluate Dr. Bergman's evaluation findings because "no opinion was given." (AR at 22.)

reviewed the opinion submitted by Mr. Rund and Ms. Rock and concluded that the opinion was inconsistent with the Providers' own treatment notes, which "indicate generally normal mental status functioning and improvement, apart from motivational difficulties. Therefore, the opinions are not persuasive and given limited weight." (*Id.*) He concluded, "Overall, a preponderance of the evidence suggests that the claimant is capable of simple, repetitive tasks consisting of 1-2 step command in a low production work setting with limited public contact." (*Id.*) The ALJ gave the state agency psychologists' opinions some weight, noting that the psychologists did not have a treating relationship with Claimant and that they did not have the opportunity to review a complete record. (*Id.* at 22.)

Although Claimant stated that she needs reminders to take medications and to shower and that she got "overwhelmed anxious and forgot" when doing things like handling money and paying bills, needing reminders to take medications does not necessarily mean a person is disabled. *See, e.g., Kvidahl v. Colvin*, No. C14-0036, 2015 WL 134349, at *11-12 (N.D. Iowa Jan. 9, 2015); *Rohwer v. Astrue*, No. C11-4110-LTS, 2013 WL 124425, at *3, *15 (N.D. Iowa Jan. 9, 2013).

I find that the ALJ's analysis of these opinions weighs in favor of affirming the ALJ's decision on this issue. *See Moore*, 572 F.3d at 522 (the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

> ## ii. *Whether ALJ's Opinion that the Record Does Not Support a Marked Finding in the Claimant's Ability to Respond Appropriately to* **Work Pressures in a Usual Work Setting** *is in Concert with* **Lucus v. Saul**, *960 F.3d 1066*

Ms. Rock and Mr. Rund checked the box stating that Claimant would have marked limitations in her ability to "[r]espond appropriately to work pressures in a usual work setting." (AR at 738.) Mr. Rund did not write any comments specifically related to this

opinion, writing comments only related to Claimant's moderate limitations in her abilities to interact with various people in a work environment. (*Id.*) Ms. Rock wrote comments related to many different categories, including this one, which said, "Medical & psychological symptoms persist, adversely affecting patient's mood & ability to function. Racing thoughts, excessive worry & difficulty getting anything done." (*Id.*)

The ALJ stated, "The record does not support a marked finding in the claimant's ability to respond appropriately to work pressures in a usual work setting." (AR at 23.) Claimant asserts that the ALJ's decision on this point "is insufficient following *Lucus v. Saul*." (Doc. 16 at 15.) In *Lucus*, the ALJ failed to provide good reasons for giving a treating psychiatrist's opinion partial weight, which was not harmless error because if the opinion had been adopted, the RFC and hypotheticals might have changed. 960 F.3d at 1069-70.

*Lucus* can be distinguished from the case at bar first because that case evaluated a treating psychiatrist's opinion, which was entitled to controlling weight if it was well-supported by medical evidence and not inconsistent with substantial evidence in the record. 960 F.3d at 1067-68 (citations omitted). The Providers, on the other hand, are non-acceptable medical sources over whose opinions the ALJ had more discretion: the ALJ was permitted to consider any inconsistencies found in the record when weighing the Providers' opinions. *Peterson*, 2016 WL 1611480, at *6 (quotation omitted). Any inconsistency in the record can support an ALJ's decision to discount the opinions of non-acceptable medical sources. *See Lawson v. Colvin*, 807 F.3d 962, 967 (8th Cir. 2015).

Second, the ALJ cited the Providers' treatment notes throughout her decision, which means she relied on them when rendering her decision, even though she did not mention them when evaluating their opinion. (*Id.* at 20-22 (citing Exhibits 3F, 11F, 12F, 13F).) While it may have been preferable for the ALJ to have restated those citations in the section of the decision focusing on the Providers' opinion, "the ALJ's arguable

deficiency in opinion-writing technique had no bearing on the outcome of [the] case and does not require remand." *Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011) (internal quotation omitted). Moreover, by the point in the decision where the ALJ summarized the Providers' opinions, it is clear that while Claimant had "a longitudinal history of depression and anxiety," complained about a lack of motivation, sleep problems, feeling tired, and issues with medication compliance that affected her mood—mostly based on citations to the Providers' treatment notes—Claimant was able to function when she was compliant with her medications. The ALJ noted that the Providers' treatment notes indicated that in spite of Claimant's complaints, she was able to participate in household tasks, attempt to "reclaim some space [in her house] back one room at a time, and cut firewood. (AR at 20-22 (citing AR at 491, 498, 505).) The ALJ also stated that Claimant reported that she tries to stay active. (*Id.* at 22 (citing AR at 580 (Mr. Rund treatment note).) I also note that while the ALJ stated that Claimant experienced overall symptom relief from medication, the ALJ acknowledged the ups and downs Claimant experienced during her medication management appointments with Ms. Rock. (*Id.* at 20-22.) Thus, the Providers' opinions were not in concert with the record as a whole.

Citations to the Providers' opinions take up the equivalent of an entire page in the ALJ's decision. None of the citations support the conclusion that Claimant cannot respond appropriately to work pressures in a normal work setting when she is compliant with her medications. As discussed above, although Ms. Rock's treatment notes acknowledge Claimant's history of racing thoughts, excessive worry and being unable to get anything done, frequent restlessness, a tendency for her mind to go blank from time to time, anxiety, and worry about her situation and circumstances (*Id.* at 494, 501, 561, 568, 586, 590, 602), these symptoms improved with medication. (*Id.* at 21, 494, 501, 561, 568, 586, 590, 602.) Ms. Rock also noted a lack of compliance with medications, which affected Claimant's mood. (*Id.* at 561, 586, 590, 602.) The ALJ noted Claimant's

lack of compliance with medications. (*Id.* at 21.) As stated above, an impairment that is controlled with treatment or medication is not considered disabling. *Brace*, 578 F.3d. at 885. Ms. Rock consistently noted that Claimant's concentration was intact, in spite of noting a history of Claimant having days where she functioned well and others where she "is barely able to do anything." (AR at *e.g.* 501, 561, 586, 602.) Claimant sometimes reported that she did not sleep well for a few days and then would "crash" from exhaustion. (*Id.* at *e.g.* 494, 501, 561, 568, 586, 602.) However, Claimant admits she sleeps better when she remembers to take her medication. (*Id.* at 494, 561, 568, 586; *see also id.* at 586, 590 (stating mood problematic when not consistent with medication).)

Although Claimant testified that she gets so anxious and depressed, she does not want to leave the house, she also testified that medication has significantly reduced the number of bad days she spends in bed, even though she still has about one-day-per-week when she does not get out of bed. (*Id.* at 67-68.) In addition, the RFC limited Claimant to jobs with simple instructions and the need to make simple work-related decisions. (*Id.* at 18.) Moreover, although Claimant testified that she "pretty much stopped" cleaning, grocery shopping, cooking, running a chainsaw and wood splitter, and taking care of chickens as of August 2016, evidence indicates that she was still doing some of these things during the relevant time period. (*Id.* at 21, 25, 253 (grocery shopping in stores for three hours at a time and shopping online in May 2017); 505 (cutting fireplace wood in March 2017).) Claimant also cleaned her house, mowed her lawn on a riding lawn mower, and did dishes and laundry one or two days-per-week for three-to-four hours during the relevant time period. (*Id.* at 25, 252.) RFC is what the claimant can still do despite her limitations. *Guilliams*, 393 F.3d at 801. Thus, I find that the ALJ in this case gave good reasons for affording the Providers' opinion on this point the weight she did, unlike the ALJ in *Lucus*. *See Lawson*, 807 F.3d at 967 (allowing ALJ to discount opinions of non-acceptable medical sources for any inconsistency).

In conclusion, I find that the ALJ's analysis of this opinion weighs in favor of affirming the ALJ's decision on this issue.

### iii.    Conclusion

I find that the ALJ's decision allowed me to follow her reasoning and that for the reasons discussed above, the ALJ's decision is consistent with other evidence in the record.  Therefore, I recommend affirming the ALJ's decision on this issue.

**B.    Whether the ALJ Provided Good Reasoning for Finding that Claimant was not Credibly Reporting Her Limitations**

Claimant argues "the ALJ did not provide good reasons for finding [she] was not credibly reporting her work limitations leading up to her last date insured." (Doc. 16 at 11.)  Claimant contends that "had subjective reports of limitations been properly evaluated, the ALJ may have awarded benefits given the vocational expert testimony." (*Id.*)

### 1.    Legal Standards

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms. *Id.* § 404.1529(b),(c).  When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski* factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side

effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[8] An ALJ is not required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[es] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

After considering the factors and evidence, the ALJ determines the extent to which the claimant's symptoms affect the claimant's capacity to perform basic work activities. *Id.* § 404.1529(c)(4). The claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Wagner*, 499 F.3d at 851 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

The ALJ evaluated Claimant's subjective complaints in the following way:

Notably, the record of evidence revealed that the claimant . . . lives with her husband and her 16 year old child. The claimant was able to attend her child's school events (Testimony). The claimant testified that she was able to clean the house (Testimony). The claimant reported that on good days, she takes her [child] to school, mows the lawn with a riding mower, and cleans the kitchen (5E p.3). The claimant alleged that she can do chores around the house one or two days a week on average for three to four hours (4E p.3). The claimant goes shopping once or twice a month for about three hours (4E p.4). In her second function report that she filled out at the reconsideration level, the claimant alleged that she can no longer shop (10E

---

[8] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v),(vi).

p.5). However, she provided no reasoning for why this change occurred in four months. The claimant is able to watch her [child]'s school performances (4E p.5).

In sum, the above residual functional capacity assessment is supported by the objective medical evidence contained in the record. Treatment notes in the record do not sustain the claimant's subjective allegations. The claimant did experience some level of limitations, but only to the extent described in the residual functional capacity.

(AR at 25.)

### 1. The Parties' Arguments

Claimant asserts that Claimant's "sporadic and limited activities during the relevant period do not evidence an ability to perform fulltime competitive work." (Doc. 16 at 8 (citing *Ross v. Apfel*, 218 F.3d 844, 849 (8th Cir. 2000).) Claimant also notes that doing things like grocery shopping and activities on her family's acreage "pretty much stopped in August [2016] after she hurt her back." (*Id.*) Claimant states that she tried to resume normal activities, but had difficulty doing so. (*Id.* (citing AR at 239, 250-57).) Claimant also argues that the record shows that during the relevant time period, she was spending much of her time in bed, which is something the ALJ did not discuss when evaluating her activities. (*Id.* at 8; 10 (citing AR at 558, 565, 577, 626); 11 (citing AR 73: "Sometimes I am in bed for two or three days. I get up to go to the bathroom, and I wake up when my husband brings me meals.").)

Claimant also cites the Providers' treatment notes wherein she stated she was tired and did not want to do much of anything in February 2017, felt bad and tired all the time in July 2017, and had difficulty getting out of bed due to constant pain in August 2017. (*Id.* (citing AR 494, 586, 597).) She also states that her mental health deteriorated to the point where she went to the emergency room for panic attacks and finally underwent

27

inpatient mental health treatment. (*Id.* at 10 (citing AR 662, 667-78, 690-92, 699-700, 702, 704).)

Claimant also notes that when she had carpal tunnel release surgery and a procedure to excise a lesion on her left foot during the relevant time period, her father helped around the house during her recovery from the surgeries. (*Id.* at 8-9 (citing AR at 550, 555, 609.) Claimant also claims that she had lower back pain. (*Id.* at 9 (citing AR 733).)

Claimant takes issue with the ALJ's statement that Claimant provided no explanation for no longer shopping in September 2017 (AR at 300), something Claimant stated she did for three hours at a time in her first function report in May 2017 (*Id.* at 253) and stated she did not do in September 2017. (Doc. 16 at 9.) Claimant argues,

> The change is apparent—Ms. Galloway's mental health deteriorated to the point where she required inpatient treatment and her psoriasis was flaring during this period. She explained she was in pain in this function report. (TR 297, 304). Her even more limited activities reported in the later function report were consistent with the record as a whole.

(*Id.*) Claimant also takes issue with the ALJ relying on her reading her Kindle and compiling bankruptcy paperwork as evidence that her limitations were not consistent with the longitudinal evidence of record. Claimant asserts that the ALJ did not develop the record regarding what compiling bankruptcy paperwork actually entailed and, noted that, in fact, Claimant never did this because her husband decided not to file bankruptcy. (*Id.* at 9-10 & n.4.)[9]

Claimant concludes that the ALJ's errors in evaluating her subjective limitations was not harmless because Claimant asserts the VE testimony shows her limitations preclude substantial gainful activity. (*Id.* at 10 (citing AR 77 (VE testimony that being

_____

[9] Claimant also cites treatment from months before the relevant time period and from over a year after her LDI. (Doc. 16 at 10.)

28

off-task 20 percent of a workday or missing two or more days of work per month precluded competitive work).)

The Commissioner counters by arguing that substantial evidence supported the ALJ's evaluation of Claimant's subjective complaints and that Claimant's "focus on a few details she considers supportive of her subjective complaints fails to surmount the deferential standard of review." (Doc. 17 at 18-19.) The Commissioner divided Claimant's impairments into mental impairments and physical impairments. This division is an efficient way to address this issue, although ultimately all of the impairments are taken into consideration.

### a.    The ALJ's Evaluation of Claimant's Mental Impairments

The Commissioner first asserts that the ALJ properly considered inconsistencies between Claimant's subjective complaints and the medical evidence of her mental impairments. (*Id.* at 19-20 (citing AR at 17-22).) The Commissioner notes that although Claimant testified that anxiety was the primary reason she could not work, followed by depression, and then her physical problems (AR at 69), in June 2017, Claimant told the consulting examining psychologist, Mr. Bergman, that she would be working if not for her physical pain (AR at 514). (*Id.* at 19.) While the Commissioner acknowledges that Claimant complained to her healthcare providers about staying in bed for more than a day at a time, Dr. Labio, the psychiatrist who treated her during her inpatient mental health treatment, suggested that Claimant exaggerated her symptoms, noted that Claimant had a tendency to tell conflicting stories, and opined that her sleep disturbances could be the result of excessive use of pain medication. (*Id.* at 19-20 (citing AR at 21, 700, 703).) The ALJ also noted that despite fluctuations in mood, Claimant's mental health providers usually described her as well-groomed, alert, and oriented with intact memory, an adequate fund of knowledge, and unimpaired thought processes. (*Id.* at 19 (citing AR 20-22, 468, 479, 485-86, 496, 502-03, 511, 562-63, 570, 588, 592, 599, 604, 689, 742,

812, 816, 822).)  The ALJ also noted that Claimant's mental health symptoms improved with treatment, something Claimant acknowledged at the hearing.  (*Id.* (citing AR at 20-22, 67-68, 611-12, 846).)

Claimant replied to the Commissioner's brief and stated, "Defendant cited to several records to show generally good functioning 'despite fluctuations in mood' but almost all these records generally are consistent with Ms. Galloway's reported limitations." (Doc. 18 at 5.)  Claimant cites to notes that say the following things.  "Ill appearing and appears distressed.  The appearance was tired." (*Id.* (citing AR at 468, 479).)  "Appears mildly distressed.  The appeared was tired." (*Id.* (citing AR at 485, 495, 502).)  "In mild distress.  The appearance was tired." (*Id.* (citing AR at 58[7], 591, 603).)  "The appearance was tired." (*Id.* (citing AR at 562, 569).)  "Appears fatigued." (*Id.* (citing AR at 812, 816).)  "Concentration: Impaired (Severe)." (*Id.* (citing AR at 822).)  I will first address these citations.

AR 468 is irrelevant to this analysis because it is a treatment note from December 2, 2016, almost three months prior to Claimant's onset of disability date.  It is also irrelevant because at that point in time, Claimant had never received any mental health treatment and it is well established that Claimant's moods are not well controlled when she skips her medication.  AR 479 and 485 are also irrelevant because they are dated prior to Claimant's onset of disability date.  In addition, Claimant was non-compliant with her mediation on the date AR 479 was written.  (AR at 476.)  AR 812, 816, and 822 are also irrelevant because they are dated from four-to-eighteen months after Claimant's LDI.  As the ALJ noted, a May 2018 treatment note revealed that Claimant stopped taking her medications after her LDI and that "her self care ha[d] really not been a priority." (*Id.* at 23 (noting that Claimant had "been off her meds for quite some time").)  AR 495 attributed Claimant's "recent difficulties" to dealing with pain from her work injury, to "feeling down and dejected due to significant financial problems," and

learning she was officially terminated from her job. Claimant's mood, motivation, and energy issues were tied to her worsening medical condition. (*Id.*) However, Claimant's mood and symptoms had improved with medications. (*Id.*) AR 502 noted that Claimant slept better when she remembered to take her mirtazapine, something the ALJ also noted. Claimant also reported that in spite of "having trouble feeling motivated and trouble sleeping at night," she was doing "okay" and was experiencing an "overall improvement in mood." Claimant said she was "doing better" since starting olanzapine. (*Id.*) On the dates AR 587, 591, and 603 were written, Ms. Rock noted that when Claimant is not consistent with her medication, her mood is more problematic. (AR at 586, 590, 602.) Claimant was also feeling "anxiety and worry about her situation and circumstances" and stress related to physical health issues that Ms. Rock identified as "cancer and lupus." (*Id.*) AR 562, a treatment note that documented "tired appearance," also documented Claimant saying, "I missed doses of my medication and can tell the difference. I need to get back on it again." (AR at 561.) Finally, AR 569, which also documented tired appearance, noted that although Claimant was feeling tired and low since restarting a medication a few weeks prior, Claimant was having "a lot of pain," was angry with her mother, frustrated with her child, and had no concerns related to anxiety. (AR at 568.) Thus, many of the treatment notes cited by Claimant involved situational stressors, which cannot form the basis of a disability finding, *see Gates*, 627 F.3d at 1082, or medication noncompliance, which also cannot form the basis of a disability finding. Moreover, none of these findings undermine the parts of the notes cited by the Commissioner. Claimant admitted at the hearing that her depression and accompanying tendency to spend entire

days in bed is improved with medication and that she only stays in bed once every seven-or-eight days.[10]  (AR at 67-68.)

Claimant's argument that the ALJ did not discuss that she spent much of her time in bed during the relevant time period is without merit.  The ALJ stated that Claimant complained that she slept for days at a time.  (AR at 23 (citing AR 539 (Claimant stated "she was sleeping for days at a time, which was not like her").)  In addition, throughout the decision, the ALJ noted Claimant's fatigue and complaints of being tired.  (AR 21-22 (citing AR 502, 568, 602).)  Just because the ALJ did not mention in her decision every time Claimant stated she slept for days does not mean she did not consider that evidence when making her decision.  *See Wildman*, 596 F.3d at 966 (an ALJ is not required to discuss every piece of evidence submitted and "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered" ) (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)) (bracket in original).

Claimant also relies on her emergency room visits for panic attacks and her voluntary inpatient mental health treatment as support for her arguments.  Claimant asserts that deterioration in her mental health, in part, supports the change in her ability to shop noted between the two function reports she filed with SSA.  The ALJ acknowledged both the emergency room visits and Claimant's inpatient treatment.  (AR at 21-22.)  The ALJ noted that Claimant was stable when she was discharged from treatment. (*Id.* at 21.)  The ALJ also noted that during inpatient treatment, Claimant's medications were modified and Claimant stated that "she will make suicidal statement if that is what it takes to get inpatient treatment." (*Id.* (citing AR at 690).)  The ALJ also noted that Claimant was observed "smiling, laughing, and joking and she was interacting

_____

[10] The ALJ obviously did not believe this testimony because the VE testified that missing work 20 percent of the time would preclude a person from working fulltime.  (AR at 77.)  However, Claimant's testimony shows that medications help her manage her depression.  (AR at 67.)

appropriately with peers and staff." (*Id*. at 21-22 (citing AR at 757).) Moreover, in context, the ALJ's statement that Claimant did not provide a reason for her change in shopping abilities in her second function report (AR at 24) is not surprising because Claimant wrote detailed explanations for her answers to the other questions on the form. (*Id*. at 297-304.) That being said, the ALJ's comment does not indicate that her decision is not supported by the record as a whole or that the ALJ did not consider the second function report. In fact, it shows that the ALJ considered the report. As discussed above, the record does not support the finding that Claimant's mental health concerns were as limiting as she and her opinion-writers assert. Moreover, Claimant said she could shop for three hours at a time during the relevant time period and did not complete the second function report until three days before her LDI. (AR at 304.) Thus, the ALJ was entitled to rely heavily on the first function report as well as the second function report.

Finally, Claimant takes issue with the ALJ's reliance on her ability to read her Kindle and help with bankruptcy paperwork, something that Claimant asserts never even occurred. Even without the bankruptcy paperwork, there was other evidence in the record that supported the ALJ's conclusion regarding Claimant's subjective mental health complaints. The ALJ noted that Claimant is able to drive her child to and from school and attend her child's school performances (*Id*. at 23-24 (citing AR at 254 (function report) 265-72 (third party function report of Claimant's husband)).) In addition, the ALJ gave some weight to the opinions of the state agency consultants who noted that Claimant could go out alone, shop both in stores and online, cook (simple microwaveable food, according to Claimant), drive, and take care of pets (only occasionally, according to Claimant). (*Id*. at 84, 110.)

Accordingly, while the ALJ's decision was not a "model of clarity" on this point, it sufficiently identified the evidence that supported her conclusion. *See Brace v. Astrue*, 575 F. Supp. 2d 1063, 1081 (N.D. Iowa 2008), *aff'd*, 578 F.3d 882 (8th Cir. 2009).

### b.    The ALJ's Evaluation of Claimant's Physical Impairments

Claimant bases her arguments related to physical impairments on her back pain and recovery from two surgeries. Specifically, Claimant argues that she had difficulty getting out of bed due to constant pain in August 2017, and that during the relevant time period she was "awaiting a carpal tunnel release procedure and a left foot lesion excise procedure" and during her recoveries from the procedures, her father helped around the house. (Doc. 16 at 8-10 (citing AR 550, 555, 597, 609, 733).)

The ALJ noted that Claimant had a history of a spine disorder for which she received treatment prior to her onset of disability date and after her LDI. (AR at 19.) The ALJ noted that Claimant "has received limited treatment for her spine disorder." (*Id.*) Indeed, Claimant cites only three treatment notes related to back pain (AR 438, 441, 773), only one of which is during the relevant time period and that merely gives a history of Claimant's 2016 back injury and treatment and says "[c]ontinues to have pain mostly in her lower back and down the sides of the lower back." (*Id.* at 773.) Claimant also testified that she did not mention back pain to her primary care provider or rheumatologist in spite of being in "constant" pain since 2016. (*Id.* at 64.) The ALJ's assessment of this impairment was appropriate. This type of sporadic treatment is not enough to prove a disability. *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (holding that a conservative course of treatment can weigh against a claim of disabling impairment.).

Claimant claimed to be in constant pain due to her psoriasis. (AR at 596.) The ALJ evaluated this impairment and noted that Claimant was only diagnosed with psoriatic arthritis a month prior to her LDI. (*Id.* at 20 (citing AR at 531-39).) The ALJ noted that Claimant had trouble making good grips and attributed pain in her hands, feet, hips, and knees to the disease. (*Id.* (citing AR at 539).) In September 2017, Claimant complained of pain in her low back, hands, wrist, and knees. (*Id* (citing AR 733).) The

ALJ also noted that Claimant was on Humira and that Claimant exercised "7+" times-per-week. (*Id.* (citing AR at 731).) Claimant testified that she had recently started on a new two-medication treatment plan for her psoriatic arthritis, but that during 2017, she tried Cosentyx, which made her ill. (*Id.* at 61-62.) Claimant further testified that walking, standing, and lifting more than a gallon of milk are difficult because of this condition. (*Id.* at 62-63.) As with Claimant's back pain, the ALJ found that claimant had received limited treatment for her psoriasis prior to her LDI, which can weigh against Claimant. *See Milam*, 794 F.3d at 985. Claimant does not take issue with this conclusion. Claimant also does not take issue with the part of her RFC stating she can "frequently handle and finger bilaterally." (AR at 18.) In addition, a September 28, 2017 treatment note cited by Defendant, but not by the ALJ, notes that "Claimant thinks her skin is doing real well," and that Claimant's "skin looks really clear." (*Id.* at 846; *see also* AR at 516 (psoriasis "improved" on June 9, 2017).) Thus, it appears that during the relevant time period, what treatment Claimant received for her psoriasis was helpful and thus, psoriasis cannot form the basis for a disability finding. *See Brace*, 578 F.3d. at 885.

Moreover, as the ALJ noted, evidence regarding Claimant's walking abilities are mixed as Claimant stated in the same function report that she can only walk 10 to 50 feet before needing a rest, but also said she could shop for several hours at a time. (*Id.* at 22 (citing AR at 250-57).) Claimant testified she could walk ten minutes before needing a rest. (*Id.* at 62.) The ALJ also stated that "[i]n June 2018, it was noted that the claimant's gait and stance were normal." (*Id.* at 19 (citing AR at 570).) This was a typographical error. The treatment note is dated June 2017. As previously discussed, when the ALJ cited treatment notes after Claimant's LDI, she noted she was doing so. In addition, Ms. Rock consistently noted that Claimant's gait, stance, and posture were normal during the relevant time period. (*Id.* at 496, 503, 563, 570, 588, 592, 604.) Claimant's RFC states

35

that Claimant would need to "avoid walking on grossly uneven ground." (*Id.* at 19.) I find that the ALJ's decision on this issue is supported by the record as a whole. *See Crawford v. Colvin*, 809 F.3d 404, 408 (8th Cir. 2015) ("[I]f the record shows two positions that are plausible and can be supported by substantial evidence, we must follow the ALJ's position and affirm [her] decision.") (citing *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)).

Claimant's only arguments related to her carpal tunnel release surgery and her recovery from surgery to remove a lesion from her foot are that she was "awaiting a carpal tunnel release procedure and a left foot lesion excise procedure" and during her recoveries from the procedures, her father helped her around the house. (Doc. 16 at 8-9 citing (AR at 505, 555, 609).) AR 505 notes that Claimant complained about pain and that the session was cut short because of it, but also noted that Claimant was continuing to work around the house to reclaim space one room at a time. The site of the pain is not identified. (*Id.* at 505-06.) AR 555 is the surgical record documenting successful removal the foot lesion. AR 609-10 is dated August 24, 2017 and notes that Claimant reported to Mr. Rund that both surgeries went well, her foot biopsy revealed no cancer, that her father was staying until "next Tuesday," had been helpful around the house, and that Claimant appeared "much improved" and "emotionally . . . much more in control" than in her last session. None of these notes reveal anything that undermines the ALJ's evaluation of Claimant's subjective complaints. The ALJ acknowledged that Claimant opted for carpal tunnel surgery rather than trying corticosteroid injections. (AR at 20.)

Moreover, the ALJ noted that Claimant and her husband stated that Claimant shops, uses the riding lawn mower, drives her child to and from school, does chores around the house "one or two days a week for three to four hours," and attends school performances. (*Id.* at 24 (citing AR at 252-54, 262, 266).) Although Claimant and her husband reported a decrease in such activities as cooking and shopping in September

2017, Claimant still drove her child to and from school, read, loaded the dishwasher, did laundry, cut grass on her riding mower for 30 minutes at a time, and visited friends at her home. (*Id.* at 265-72, 297-304.) Although Claimant stated that lifting dishes was difficult, she also stated in the same document that she could lift 15-20 pounds, although "not for long." (*Id.* at 299, 302.) Claimant also attends medical appointments, drives, independently, does self care, although with modifications so as not to exacerbate her psoriasis (i.e., she no longer shaves). (*Id.* at 251, 298.) Claimant also states that she needs reminders to shower and has difficulty tying her shoes and buttoning because of hand pain. (*Id.*) In spite of Claimant saying that she gave up hobbies like wood burning, Claimant was able to get back to the hobby in July 2017 after she began physical therapy for her carpal tunnel syndrome and, as the Commissioner notes, continued doing this craft after her LDI. (*Id.* at 629, 630, 821 (Dec. 2017 treatment note).)

Therefore, the ALJ's decision on this issue did not fall outside the available zone of choice within which the ALJ could decide the case. *See Hacker*, 459 F.3d at 936. I recommend the District Court affirm the ALJ's decision on this issue.

## C.     *Whether the ALJ Fully and Fairly Developed the Record*

Claimant argues that the ALJ did not fully and fairly develop the record regarding her impairments. Claimant argues that the ALJ should have obtained medical expert testimony regarding Claimant's physical limitations because the record contains no treating or examining opinion and because "a limitation to sedentary exertional level was potentially outcome determinative." (Doc. 16 at 16.) Claimant also argues that "all but [Dr. Becker] . . . found [she] had significant mental limitations and many of these limitations were not accounted for in the ALJ's RFC." (*Id.*) Thus, according to Claimant,

> The ALJ thought [Dr. Becker's] opinions were wrong, as the ALJ found
> Ms. Galloway had severe mental impairments and mental limitations in her
> RFC. (See also TR 22) (discussing weight afforded to agency consultants,

and concluding they were given some weight inasmuch as they are consistent with the record as a whole presumably, this boilerplate means for the first agency psychological consultant opinion, it was given no weight as it was not consistent with the record as a whole). The rest of the opinion evidence generally supports at least Reasoning Level 1 limitations . . as well as additional limitations not accounted for in Ms. Galloway's RFC. If the ALJ did not believe the professional opinions available, the ALJ should have further developed the record to determine the degree to which Ms. Galloway's mental impairments limited her ability to engage in work-related activities. *Lauer v. Apfel*, 245 F.3d 700, 706 (8th Cir. 2001).

(*Id.* at 16-17.) Thus, according to Claimant, her case required further record development. (*Id.* (citing *Noerper v. Saul*, 964 F.3d 738, 744-47 (8th Cir. 2020).)

A "social security hearing is a non-adversarial hearing, and the ALJ has a duty to fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). The ALJ bears this responsibility "independent of the claimant's burden to press [her] case" and it extends to cases where claimants are represented by counsel at the administrative hearing. *Snead v. Barnhart,* 360 F.3d 834, 838 (8th Cir. 2004). However, the Eighth Circuit has held:

> Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment. *Snead,* 360 F.3d at 836; 20 C.F.R. § 404.1512. Past this point, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Naber v. Shalala,* 22 F.3d 186, 189 (8th Cir. 1994).

*Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013). The inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993). Absent unfairness or prejudice, remand is not required. *Id.* (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988)).

In addition, the ALJ must determine a claimant's RFC "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (alteration in original)).

"Because [a] claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citation omitted). "However, there is no requirement that an RFC finding be supported by a specific medical opinion." *Id.* (citing *Myers*, 721 F.3d at 526-27) (affirming RFC without medical opinion evidence); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same)). "In the absence of medical opinion evidence, 'medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings.'" *Id.* (alteration in original) (quoting *Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011)).

Although Claimant bears the burden to "provid[e] the evidence [the ALJ] will use to make a finding about [Claimant's] residual functional capacity," the ALJ is "responsible for developing the claimant's complete medical history." 20 C.F.R. § 404.1545(a)(3) (2019). "The ALJ's obligation to develop the record 'is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.'" *Coleman v. Colvin*, No. 13cv1004 EJM, 2013 WL 4069523, at *2 (N.D. Iowa Aug. 12, 2013) (quoting *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001)). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)); *Martin v. Berryhill*, No. 1:18-CV-00004 JM/PSH, 2019 WL

138655, at *6 (E.D. Ark. Jan. 8, 2019) (explaining that "the ALJ must weigh the various medical opinions in the record") (citation omitted), *R. & R. adopted*, 2019 WL 334202 (E.D. Ark. Jan. 25, 2019). "No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment." SSR 96-4p, 1996 WL 374187, at *1.

In the case at bar, the ALJ rightfully noted that Claimant sought very little medical attention for her physical impairments. As noted above, sporadic treatment is not enough to prove a disability. *Milam*, 794 F.3d at 985. Claimant does not even specify which of her claimed physical impairments she now asserts should have been evaluated. Claimant testified that her physical conditions are her least-disabling conditions. (AR at 69.) The ALJ cited to treatment notes related to Claimant's psoriatic arthritis, a spine disorder/back pain, and carpal tunnel syndrome. (*Id.* at 19-20.) The ALJ also acknowledged Claimant's claims that she was severely limited in her physical abilities and assessed her daily activities. (*Id.* 19, 21, 24.) Here, Claimant was not treated unfairly or prejudiced by the ALJ's decisions regarding Claimant's physical impairments. Claimant simply did not seek much medical attention for these impairments and what attention she did seek seems to have been helpful. Based on the record before the ALJ, she was "permitted to issue a decision without obtaining additional medical evidence" because "other evidence in the record provide[d] a sufficient basis for the ALJ's decision." *Kamann*, 721 F.3d at 950 (quoting *Naber*, 22 F.3d at 189).

Likewise, the ALJ was not required to obtain a mental health assessment in addition to the assessment SSA already ordered and that was conducted by Dr. Bergman in June 2017, midway through the relevant time period. In addition to Dr. Bergman's assessment, the record contained opinions from two state agency psychiatrists and three

of Claimant's mental healthcare providers, Dr. Johnson, Ms. Rock, and Mr. Rund. As discussed above, the ALJ provided good reasons supported by the record as a whole for the weights assigned to the various opinions in the record. Claimant's argument that "[i]f the ALJ did not believe the professional opinions available, the ALJ should have further developed the record to determine the degree to which Ms. Galloway's mental impairments limited her ability to engage in work-related activities," is not in concert with the rules, which do not require an ALJ's decision be supported by opinion evidence, let alone, specific opinion evidence. *See Hensley*, 829 F.3d at 932 (holding that medical evidence can support an ALJ's decision). Here, the ALJ cited medical evidence, including evidence from the opinion writers, themselves, that undermined the opinion evidence. In this way, the instant case can be distinguished from *Lauer v. Apfel*, 245 F.3d 700, 706 (8th Cir. 2001), cited by Claimant. Just because the ALJ found that Claimant was capable of more than reasoning level 1 jobs does not mean the ALJ made an incorrect decision.[11]

*Lauer* found that even if the ALJ properly explained why he did not give controlling weight to the opinions of the claimant's treating psychiatrists, medical evidence did not support the ALJ's conclusions regarding the severity of the claimant's mental limitations. 245 F.3d at 704. *Lauer* held that the ALJ's opinion was "unclear as to the medical basis, if any, for his assessment of the degree to which Mr. Lauer's mental impairments affected his RFC," stating that much of the evidence was based on evidence provided by health care professionals who were not mental health specialists. *Id.* at 705. The court found it significant that although the ALJ ordered a psychiatrist to administer three tests to the claimant after the close of testimony and before the ALJ rendered his decision, the ALJ "rejected . . . virtually all of Dr. Henze's analysis of the test results

---

[11] This issue will be discussed more fully in part III.D, *infra*.

and never submitted the test results to the medical advisor or to any other professional for review." *Id.* at 705-06. Here, as discussed above, the ALJ spent much of the decision evaluating Claimant's mental impairments. (AR at 20-23.)

Finally, Claimant cites *Nevland v. Apfel,* 204 F.3d 853, 857 (8th Cir. 2000) for the proposition that a claimant's RFC must ordinarily be supported by a treating or examining source opinion to be supported by substantial evidence. (Doc. 16 at 16.) However, *Nevland* only requires remand when the record contains no medical evidence supporting the ALJ's decision and the ALJ relies solely on the opinion of a non-treating, non-examining consulting physician to craft the RFC, which is not the situation with the case at bar. 204 F.3d at 858. Here, the ALJ did not assign "no weight" to any of the opinions. (AR at 22-23 ("some weight" to state agency consultants' opinions, "partial weight" to opinions of Mr. Rund and Ms. Rock, and "little weight" to opinions of Dr. Johnson).) I note that although Dr. Becker opined that Claimant's mental impairments were not severe, he and Dr. Brandon, who reviewed Claimant's record on reconsideration after Claimant's LDI, both agreed that Claimant's activities of daily living were "generally consistent" and that "mental limitations appear to be secondary to physical problems." (AR at 85, 111.) Although Dr. Brandon reached a different conclusion regarding the severity of Claimant's mental impairment, given the entire record, that does not mean the ALJ assigned Dr. Becker's opinion no weight. The ALJ specifically stated that she assigned some weight to the "*opinions* of the State Agency *consultants* . . . . inasmuch as *they* are consistent with the record as a whole. (AR at 22 (emphasis added).) Thus, where Drs. Becker and Brandon agree and where their opinions are supported by the record as a whole, Dr. Becker's opinion is entitled to some weight. I have already concluded that the ALJ properly evaluated Claimant's subjective complaints. *See* part III.B, *supra*. In addition, the RFC, which limits Claimant to unskilled simple work involving occasional contact with others, is in concert with part of

each of the opinions, in spite of the ALJ not giving any opinion controlling weight. (AR at 18, 24, 85, 111, 737-38, 849.) Thus, the opinion evidence and all the previously-discussed medical evidence support the mental RFC in this case and further development of the record is not required. I recommend the District Court affirm the ALJ's decision on this issue.

## D.    *Whether the ALJ Presented a Proper Hypothetical to the Vocational Expert*

This issue is the main point of contention. Claimant asserts that the ALJ erred by presenting a hypothetical to the VE based on an RFC that did not include all of Claimant's impairments. This, Claimant argues, resulted in a denial of benefits that was not supported by the record as a whole. Specifically, Claimant argues that the jobs the VE propounded and that the ALJ adopted at step five to find there were jobs in the national economy that Claimant could perform were inappropriate for Claimant because they were reasoning level 2 and 3 jobs, which are incompatible with the RFC requirement that limits Claimant to jobs with "simple instructions" paired with "simple work related decisions" and a "routine work setting." (Doc. 16 at 5 (citations omitted).) Thus, according to Claimant, "[r]emand . . . is required to address this Social Security Ruling 00-4p error by the ALJ." (*Id.* (citing *Stanton v. Comm'r, Soc. Sec.*, 899 F.3d 555, 559-60 (8th Cir. 2018) for the proposition that *Stanton* "explain[s] how SSR 00-4p issues are evaluated generally and [the] ALJ's duty to recognize and resolve conflicts between the vocational expert's testimony and the requirements of jobs per the DOT").)[12]

Claimant also argues that evidence in the record supports a finding that "the ALJ intended to preclude detailed instructions with the RFC." (*Id.* at 6.) Claimant cites the opinion of Dr. Brandon, the state agency consulting psychologist who found Claimant was limited to performing "simple, repetitive tasks consisting of 1-2 step commands in a

_____

[12] "*DOT*" is the abbreviation for the *Dictionary of Occupational Titles*.

low production work setting with limited public contact." (*Id.* (citing AR 130).) Claimant argues that although the ALJ stated she "was not relying heavily on the agency medical and psychological consultants . . . [the ALJ] noted, 'Nevertheless, as these consultants are specialists in their respective fields and are familiar with the definitions and evidentiary standards used by the agency, the undersigned gives their assessments some weight inasmuch as they are consistent with the record as a whole.' (TR 22)." (*Id.*) Claimant continues:

> The ordinary rule is the ALJ should have further explained why Dr. [Brandon's] opinion concerning a Reasoning Level 1-type limitation (the 1-2 step commands limitation is clearly a Reasoning Level 1 limitation per *Stanton v. Comm'r, Soc. Sec.*) was not included in Ms. Galloway's RFC if the ALJ intended to not account for it. *See Gann v. Berryhill*, 864 F.3d 947, 952-53 (8th Cir. 2017). The implication is, the ALJ thought the limitations in the RFC determination were precluding the performance of detailed instructions anyway, and the 1-2 step commands limitation was redundant given the RFC was providing Reasoning Level 1 limitations regardless. Again, the ALJ stated something equivalent to that in the RFC explanation section of the hearing decision. (TR 23) ("In addition, the opinion that the claimant has marked findings in understanding and remembering detailed instructions and carrying out detailed instructions is not necessarily pertinent because the claimant is limited to simple, unskilled work.").
>
> The ALJ either presented a deficient RFC hypothetical question to the vocational expert because the ALJ failed to specifically account for Ms. Galloway's limitations regarding her ability to perform detailed tasks, or the ALJ committed the *Hutson v. Saul* Social Security Ruling 00-4p error whichever way this ALJ step five error is framed, remand is required as the ALJ's step five denial of benefits is not supported by substantial evidence.

(*Id.*)[13]

---

[13]     SSR 00-4p provides in pertinent part that "before relying on [vocational expert] testimony or . . . evidence to support a disability determination or decision, our

The Commissioner's response will be addressed in context, below. However, the Commissioner's main assertions are that Claimant attempts to add a one-to-two step task limitation to her RFC where one does not exist; that because there is no such restriction, there is also no conflict with the reasoning level two and three jobs relied on by the ALJ; and that Claimant relies on cases that can be readily distinguished from the case at bar. (Doc. 17 at 23-26.)

### 1. Legal Standard and Relevant Facts

"Generally, if the claimant suffers from nonexertional impairments that limit her ability to perform the full range of work described in one of the specific categories set forth in the guidelines, the ALJ is required to utilize testimony of a vocational expert." *Reed v. Sullivan*, 988 F.2d 812, 816 (8th Cir. 1993) (citation omitted). "The Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to meet her burden of showing that jobs exist in significant numbers which a person with the claimant's residual functional capacity can perform." *Gann v. Berryhill*, 864 F.3d 947, 952 (8th Cir. 2017) (quoting *Sultan v. Barnhart*, 368 F.3d 857, 864 (8th Cir. 2004)). However, "[t]estimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments." *Jones v. Astrue*, 619 F.3d 963, 972 (8th Cir. 2010)

_____

adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [vocational experts] . . . and information in the Dictionary of Occupational Titles . . . and [e]xplain in the determination or decision how any conflict that has been identified was resolved."

*Engledow v. Comm'r of Soc. Sec.*, No. 20-CV-4-LRR, 2021 WL 916925, at *3 n.1 (N.D. Iowa Mar. 10, 2021) (alterations in original).

(quoting *Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 365 (8th Cir. 2007)) (noting "internal quotations, alterations, and citations omitted").

At the disability hearing, the ALJ presented the following hypothetical to the VE, which became the RFC:

> For my first hypothetical question, I'd like you to assume that we have a younger individual with a high school education, past work as you described it, and the residual functional capacity to occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. This individual could stand and/or walk six hours with normal breaks in an eight-hour workday and sit for six hours with normal breaks in an eight-hour workday. Her ability to push and pull, including the operation of hand and foot controls would be frequent within these weights. She could occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl. This individual is right-hand dominant. She could frequently reach overhead on the right, no limitation on the left; and frequently handle and finger bilaterally. She would need to avoid concentrated exposure to extreme cold; hazards such as heights and dangerous machinery; as well as fumes, odors, gases, poor ventilation, and dust. Further, this individual would be limited to jobs where she could understand, remember, and appropriately carry out simple instructions, use judgement [sic] in making simple work-related decisions, and deal with changes in a routine work setting. She could have occasional contact with the public, coworkers, and supervisors. And finally, she would need to avoid walking on grossly uneven ground. Given these limitations, could she return to her past relevant work?

(AR at 75-76.)

The VE testified that under this hypothetical, such an individual could perform jobs as an assembler, *DOT* 706.687-010, 1991 WL 679074 (Reasoning Level 2); hand packager, inspector, *DOT* 559.687-074, 1991 WL 683797 (Reasoning Level 2); or mail sorter, *DOT* 209.687-026, 1991 WL 671813 (Reasoning Level 3). (*Id.* at 76.)

### 2.    *Analysis*

[A] limitation to jobs with one-to-two-step instructions indicates a greater limitation than the limitation to simple instructions included in the final RFC

here. *See Moore* [*v. Astrue*]*,* 623 F.3d [599,] 604 [8th Cir. 2010] (RFC limitation to simple instructions could be consistent with jobs having a reasoning level higher than one, whereas limitation to one-or-two-step instructions is consistent only with reasoning level one jobs); *see also Stanton v. Comm'r, Soc. Sec. Admin.,* 899 F.3d 555 559 (8th Cir. 2018) (limitation to one-to-two-step instructions is inconsistent with jobs that require a reasoning level of two or three); *Thomas v. Berryhill,* 881 F.3d 672, 677 (8th Cir. 2018) (same).

Order at 16, *Burns v. Saul*, No. C18-72-LTS, (N. D. Iowa Jan. 10, 2020), ECF No. 19. Thus, there is no way to harmonize the parties' arguments. If the ALJ meant to incorporate a one-to-two-step limitation, then the jobs upon which the ALJ relied at step 5 are inappropriate and the case must be remanded. I find, however, that this is not the situation.

[B]ecause "detailed but uninvolved" essentially means "detailed . . . [but] not complicated or intricate," [*Moore v. Astrue,* 623 F.3d 599, 604 (8th Cir. 2010)] found that there is no inherent conflict between a limitation to "simple job instructions" and jobs having a reasoning level of one or two. *Id.* Although the instructions for a reasoning level two job may be detailed, they are also, by definition, "not complicated," i.e., simple. *Id.* Therefore, although a limitation to simple job instructions may overlap with a limitation to simple one-or two step instructions, they do not express the same limitation. *Id.*

*Id.* at 14 (second set of brackets in original).

*Burns* is instructive. In *Burns,* unlike in the instant case, the court found that the ALJ erred in failing to include a one-to-two-step limitation in a hypothetical question because the limitation was included in an opinion of a state agency consulting psychiatrist that the ALJ had given great weight and the ALJ "clearly incorporated much of [the opinion] into the final RFC determination." *Id.* at 15. The ALJ did not, however, explain why he did not include the 1-2-step limitation in the RFC after declaring that the opinion was consistent with the record as a whole. *Id.* at 15-16. *Burns* reasoned that if

47

the opinion was consistent with the record as a whole, there should have been no reason not to adopt the limitation or explain why he did not include it. *Id.* at 16.

Unlike *Burns*, in this case, the ALJ only gave the opinions of the state agency consulting psychiatrists "some weight inasmuch as they are consistent with the record as a whole." (AR at 22.) Even if I were to assume, as Claimant suggests, that the ALJ gave Dr. Becker's opinions no weight, that still means that the ALJ gave Dr. Brandon's opinion only some weight and then only inasmuch as his opinion is consistent with the record as a whole. (*Id.* at 111.) Dr. Brandon found that Claimant's activities of daily living did not appreciably change between his review after Claimant's LDI and Dr. Becker's review in June 2017 in spite of his acknowledgment of both Claimant's second function report and Ms. Rock and Mr. Rund's opinion, evidence Claimant relies upon to support her claim of lost function toward the end of the relevant time period. (*Id.*) Moreover, Dr. Brandon stated that Ms. Rock's and Mr. Rund's finding that Claimant had marked limitations in her ability to understand, remember, and carry out detailed instructions was inconsistent "with the corresponding treatment notes . . . which indicate generally normal mental status functioning and are given limited weight." (*Id.*) This finding is consistent with the record. In addition, I have already discussed why the ALJ's findings regarding Claimant's mental health limitations are supported by the record. Thus, Dr. Brandon's finding that Claimant is limited to one-to-two-step commands is not consistent with the record as a whole. Claimant did not appeal the ALJ's decision regarding the weight assigned Dr. Brandon's opinion.

The case at bar can also be distinguished from *Gann v. Berryhill*, 864 F.3d 947 (8th Cir. 2017), upon which Claimant relies. In *Gann*, the VE's testimony did not support the ALJ's step five finding because although the ALJ assigned significant weight to the opinions of the state agency consultants, the ALJ did not include the consultants' adaptive limitations in the hypothetical presented to the VE. 864 F.3d at 953-54. Here,

unlike the ALJ in *Gann*, the ALJ only assigned some weight to Dr. Brandon's opinion insofar as the opinion is consistent with the record as a whole, and therefore, the ALJ was not required to include all Dr. Brandon's limitations in the hypothetical.

In spite of this, Claimant argues there is an "implication" that "the ALJ thought the limitations in the RFC determination were precluding the performance of detailed instructions . . . and the 1-2 step commands limitation was redundant given the RFC was providing Reasoning Level 1 limitations." (Doc. 16 at 6.) Claimant asserts that the ALJ "stated something equivalent to that in the RFC explanation section of the hearing decision." (*Id.* (citing AR at 23) ("In addition, the opinion that the claimant has marked findings in understanding and remembering detailed instructions and carrying out detailed instructions is not necessarily pertinent because the claimant is limited to simple, unskilled work.").) Claimant misconstrues this sentence in the ALJ's evaluation of Mr. Rund's and Ms. Rock's opinions. "Pertinent" means "having a clear decisive relevance to the matter in hand." Merriam-Webster Dictionary, https://www. merriam-webster. com/dictionary/pertinent. Although not a model of clear legal writing, it appears the ALJ was saying that the opinion was not even relevant on this point, not that the opinion was in concert with the ability to carry out simple unskilled work. In order to achieve that meaning, the word "pertinent" must be edited out of the sentence entirely: "In addition, the opinion that the claimant has marked findings in understanding and remembering detailed instructions and carrying out detailed instructions is not necessary[y] because the claimant is limited to simple unskilled work." In addition, at steps 2 and 3, the ALJ found that Claimant had only moderate limitations in the relevant areas and mild limitations in her ability to adapt or manage herself. (AR at 18.) "[O]ur deferential standard of review precludes us from labeling findings as inconsistent if they can be harmonized. . . . [W]e may neither pick nits nor accept an appellant's invitation to rely upon perceived inconsistencies." *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th

49

Cir. 2018) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006)). Thus, I find that the ALJ did not adopt the interpretation Claimant encourages.

Claimant further argues that the reasoning level 2 and 3 jobs proffered by the VE and adopted by the ALJ are incompatible with the RFC requirement that limits Claimant to jobs with "simple instructions" paired with "simple work related decisions" and a "routine work setting." (Doc. 16 at 5 (citing *Hutson v. Saul*, 4:19-CV-3117, 2020 WL 4220084, at *6-7 (D. Neb. July 23, 2020) (finding an apparent conflict between reasoning level 2 jobs and a limitation to simple instructions); *Hutson v. Saul*, 4:19-CV-3117, WL 5653518, at *3 (D. Neb. Sept. 23, 2020) (order, denying Rule59(e) motion and further explaining issue).) Thus, according to Claimant, "[r]emand, as explained in *Hutson v. Saul*, is required to address this Social Security Ruling 00-4p error by the ALJ." (*Id.*) Claimant asserts that the ALJ "clearly meant to preclude detailed tasks with the Reasoning Level RFC limitations." (*Id.* at 5-6 (citing *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019) and *Hutson*, 2020 WL 4220084, for the proposition that an RFC limitation to simple instructions precludes jobs requiring detailed instructions "without expressly including a 'detailed instructions' limitation in the RFC").)

Contrary to Claimant's argument, reasoning level 2 jobs are appropriate for Claimants limited to jobs with "simple instructions" paired with "simple work related decisions" and a "routine work setting." First, Claimant unreasonably interprets the limitations of her RFC. The ALJ did not limit her only to a routine work setting, but limited her to "jobs where she can . . . deal with changes in routine work settings." (AR at 18.) Thus, while a routine work setting is the assumed baseline, some changes are anticipated by the RFC. This is consistent with reasoning level 2 jobs. Reasoning level 2 jobs require employees to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and d]eal with problems involving a few

50

concrete variables in or from standardized situations." *Dictionary of Occupational Titles*, App. C, https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

*Moore v. Astrue* explained why jobs with reasoning level 2 are appropriate for a claimant with an RFC limiting the claimant, in relevant part, to jobs with simple job instructions and simple, routine, and repetitive work activity at the unskilled task level:

> According to the *DOT,* those occupations each require "Level 2" reasoning, defined as the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." *DOT* at 1011. Moore contends that the hypothetical could only be satisfied by occupations requiring "Level 1" reasoning, defined in the *DOT* as the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions." *Id.*

> The ALJ did not err in relying on the vocational expert's testimony. In the hypothetical, the ALJ did not limit "simple" job instructions to "simple *one- or two-step* instructions" or otherwise indicate that Moore could perform only occupations at a *DOT* Level 1 reasoning level. Indeed, the Level 2 reasoning definition refers to "detailed but *uninvolved*" instructions. *DOT* at 1011 (emphasis added). The dictionary defines "uninvolved" as "not involved," and in turn defines "involved" as "complicated, intricate." *Webster's Third New Int'l Dictionary* 1191, 2499 (2002). There is no direct conflict between "carrying out simple job instructions" for "simple, routine and repetitive work activity," as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.

> Moreover, the Level 2 reasoning definition is an upper limit across all jobs in the occupational category, not a requirement of every job within the category. "[A] claimant's reliance on the *DOT* as a definitive authority on job requirements is misplaced because *DOT* definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." *Page* [*v. Astrue*], 484 F.3d 1040, 1045 [(8th Cir. 2007)] (internal quotation marks omitted). "The *DOT* itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain

localities." *Wheeler v. Apfel,* 224 F.3d 891, 897 (8th Cir. 2000); *see DOT* at xiii. "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the *DOT." Wheeler,* 224 F.3d at 897. There is nothing in the record to suggest that the vocational expert ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs. *See Whitehouse v. Sullivan,* 949 F.2d 1005, 1006 (8th Cir. 1991) ("[T]he ALJ could properly assume that the expert framed his answers based on the factors the ALJ told him to take into account."). Because substantial evidence supports the ALJ's phrasing of the hypothetical to the vocational expert, and there was no conflict between the vocational expert's testimony and the *DOT,* the ALJ properly relied on the testimony. *See Page,* 484 F.3d at 1045.

623 F.3d 599, 604–05 (8th Cir. 2010) (emphasis in original; alterations in *Page* citation added; footnote omitted). Moreover, a limit to simple work-related decisions is appropriate for reasoning level 2 jobs. *Gilbert v. Saul,* No. C18-2045-LTS, 2019 WL 4751552, at *17-19 (N.D. Iowa Sept. 30, 2019) (rejecting objections almost identical to arguments currently before this Court and affirming ALJ's decision that reasoning level 2 jobs were appropriate for claimant with RFC that included, in part, limitation that claimant could only make simple work-related decisions and gathering cases that support this holding). The RFC requirement that Claimant can "deal with changes in a routine work setting" is quoted verbatim from Guidance from the Social Security Administration on this issue, which provides that "[t]he basic mental demands of . . . unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, at *4.

Like in *Moore*, there is no indication here that the ALJ ignored any of Claimant's supported impairments in framing the hypotheticals presented to the VE. I addressed a similar argument last year in *Hinds v. Saul*, No. 18-CV-3065-CJW, 2020 WL 3120349,

(N.D. Iowa Feb. 3, 2020), *R. & R. adopted*, No. 18-CV-3065-CJW-MAR, 2020 WL 1043448 (N.D. Iowa Mar. 4, 2020), *appeal docketed*, No. 20-1918 (8th Cir. May 5, 2020). In *Hinds*, I held the following:

> Like the hypothetical in *Moore* that did not include a specific limitation to 1-2-step instructions, the hypothetical in the case at bar did not include a 1-2 step limitation. As *Moore* cautions, the Court is not to write into a hypothetical that which the ALJ did not write in himself. Thus, Claimant's attempt to impute a 1-to-2-step limitation where none exists is without merit.

*Id.* at *17. The same reasoning applies here. I will not write into the hypothetical a limitation that the ALJ, herself, did not include. (*See* Doc. 18 at 4 (Claimant's reply encouraging the Court to do just that ("the ALJ intend[ed] to preclude detailed instructions . . . [and] also intended to limit Ms. Galloway to understanding short, simple 1-2 step instructions").)[14]

Claimant's cited cases are not helpful to her. For support, Claimant relies on *Thomas v. Berryhill*, 916 F.3d 307, 313 (4th Cir. 2019), *as amended*, (4th Cir. 2019) ("Thomas's appeal . . . requires us to decide whether there is an 'apparent conflict' between a limitation to 'short, simple instructions' (as found in Thomas's RFC) and a

---

[14] Claimant argues, in part, that her case is being held in abeyance in the Eighth Circuit pending resolution of the Supreme Court cases in *Davis v. Saul* and *Carr v. Saul*. (Doc. 18 at 4 n.4.) The Supreme Court has now decided those cases. *See Carr v. Saul*, 141 S. Ct. 1352 (2021). However, Claimant also argues that "[t]here may eventually be some challenge to the *Hinds* case and its analysis of this sub issue. . . ." (Doc. 18 at 4 n.4.) Claimant asserts, however, that this is not relevant to this case because here, "the ALJ [implied] the RFC does account for marked limitation in understanding and remembering detailed tasks. The implied RFC limitation that is clear in this case distinguishes this case from . . . *Hinds* where the Court found no implied limitation was present." (*Id.*) For the reasons I have already explained and that will be further explained, I reiterate my finding that the ALJ did not incorporate a one-to-two step instruction limitation into the RFC. Dr. Brandon's conclusion was part of an opinion the ALJ gave only some weight, his finding is not consistent with the record as a whole, and the ALJ was not required to incorporate this conclusion into the RFC.

need to carry out 'detailed but uninvolved . . . instructions' (as found in jobs requiring Level 2 reasoning). We hold that there is."); *Stanton v. Comm'r, Soc. Sec. Admin.*, 899 F.3d 555, 559 (8th Cir. 2018); and, possibly, *Thomas*, 881 F.3d at 676-77.[15]  The latter two cases held there were conflicts between the RFCs and the reasoning level 2 and reasoning level 3 jobs that the ALJs adopted in the cases, respectively.  However, in both those cases, the RFCs contained specific one-to-two-step instruction limitations that Claimant's RFC does not contain.  Therefore, the cases can be distinguished from the case at bar.  In addition, Claimant, herself, explains why *Thomas* is unhelpful.  While advancing her argument that the ALJ meant to include a detailed instruction limitation in the RFC when she commented that Ms. Rock's and Mr. Rund's opinions regarding detailed instructions were not pertinent because Claimant was limited to simple unskilled work, Claimant said, "The ALJ was correct depending on the circuit law controlling the issue and how one views the circuit law on the issue."  (Doc. 16 at 4 (citing *Thomas*, 916 F.3d at 313).)  Claimant admits that this position "faces off" with *Moore*.  (*Id.*)  Fourth Circuit cases are not binding on this Court. They are not even persuasive when they are squarely at odds with the holdings of the Eighth Circuit.

Claimant attempts to distinguish *Moore*.  First, Claimant cites *Lucy v. Chater*, 113 F.3d 905 (8th Cir. 1997) for the proposition that "*Lucy* should trump *Moore* in a conflict on what the general rule should be for the Social Security Ruling 00-4 issue."  (Doc. 18 at 3 n.1 (citing *Madar v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) ("[W]hen faced with conflicting panel opinions, the earliest opinion must be followed 'as it should have controlled the subsequent panels that created the conflict.'") (quotation omitted)).  In *Lucy*, the ALJ made contradictory statements regarding the claimant's

---

[15] Briefing is unclear as to whether Claimant asserts that *Thomas*, 881 F.3d at 676-77 is part of this argument.  However, the Commissioner responded as if this case is part of Claimant's argument.  (Doc. 17 at 25.)

intellectual abilities before concluding, without VE testimony, that the claimant had the capacity to engage in a full range of sedentary work. 113 F.3d at 908-09 (explaining that the ALJ found claimant had borderline intellectual functioning, that his "residual functional capacity for the full range of sedentary work [was] reduced by his borderline intellectual functioning," but that claimant could engage in a full range of sedentary work, even though that range encompassed jobs that required level 2 reasoning or higher). The court remanded for the ALJ to call a vocational expert to respond to a hypothetical question that included the claimant's intellectual impairments. *Id*. at 909. Here, on the other hand, the ALJ relied on the testimony of a VE who responded to hypotheticals that included all the impairments the ALJ found supported by the record. *See Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (ALJ need only include "those impairments that the ALJ finds are substantially supported by the record as a whole" in the hypothetical question) (quoting *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994)).

First, I see no conflict between *Lucy*, a case involving a common ALJ error that the court corrected, and *Moore*, a case stating general principles that help guide both ALJs and the courts in analyzing these cases. Thus, I need not choose between the two cases and *Mader* is not implicated here. Second, to the extent Claimant independently argues that *Lucy* explains that reasoning level 2 jobs require the ability to understand and carry out detailed instructions (Doc. 18 at 3 n.1 (citing *Lucy*, 113 F.3d 905)), and that this should preclude Claimant from working at reasoning level 2 jobs, I first note that in spite of Claimant's attempt to read in additional limitations, the RFC contains no such limitations. In addition, as discussed in part III.A, *supra*, the ALJ's decision to assign Mr. Rund's and Ms. Rock's opinions partial weight is supported by the record as a whole. It is noteworthy that Dr. Brandon—the only opinion writer to suggest the one-to-two step limitation—found that Mr. Rund's and Ms. Rock's opinions stating Claimant had marked

limitations in her abilities to understand, remember, and carry out detailed instructions were not supported by their own treatment notes. (AR at 111.)

Third, Claimant's argument that the Commissioner is not allowed to rely on the part of *Moore* that states that "the Level 2 reasoning definition is an upper limit across all jobs in the occupational category, not a requirement of every job within the category" and that "the *DOT* is just a generic description of job requirements" is without merit. (Doc. 18 at 3 n.2.) Claimant relies on the Eighth Circuit's decision in *Thomas*, which addressed a situation where the claimant's RFC included a limitation to "1-2 step tasks," but the job the VE recommended and the ALJ adopted required level 3 reasoning. 881 F.3d at 676-77. The Commissioner urged the court to affirm, arguing that "[s]ince the *DOT*'s definitions 'are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range,' not every position as a new accounts clerk has 'requirements identical to or as rigorous as those listed in the *DOT*'" and thus there was no conflict between the VE's testimony and the *DOT*. *Id.* at 677. The Eighth Circuit reversed the ALJ's decision.

> An expert generally seeks to resolve such a discrepancy by specifying that he has limited his testimony to only those jobs within the DOT description that someone with the relevant RFC can perform and, in more recent years under the Commissioner's policy on apparent unresolved conflicts, by explaining the basis of his opinion that jobs within that narrower subset exist in significant number. *See, e.g.*, *Gieseke v. Colvin*, 770 F.3d 1186, 1189 (8th Cir. 2014); *Welsh v. Colvin*, 765 F.3d 926, 929–30 (8th Cir. 2014); *Jones v. Astrue*, 619 F.3d 963, 976–78 (8th Cir. 2010); *Jones v. Chater*, 72 F.3d 81, 82 (8th Cir. 1995). As those cases indicate, we usually refer to the DOT's generic breadth to affirm that an ALJ permissibly viewed an expert's explanation as having eliminated the seeming conflict. We do not use it to deny that there ever was a conflict.

> By incorporating the definition of level-one reasoning into the RFC, the ALJ indicated "that [Thomas] could perform only occupations at [that] reasoning level." *See Moore v. Astrue*, 623 F.3d at 604. An apparent

conflict thus existed between the vocational expert's testimony that someone limited to "1 to 2 step tasks" could work as a new accounts clerk and the DOT description that being such a clerk involves a higher level of reasoning. *See Rounds v. Comm'r of SSA*, 807 F.3d 996, 1003 (9th Cir. 2015); *see also Porch v. Chater*, 115 F.3d 567, 571–72 (8th Cir. 1997). Because that conflict was "apparent" and not just "possible," the ALJ needed to do more than have the expert affirm that his testimony was consistent with the DOT. *Moore v. Colvin*, 769 F.3d at 990.

*Id.* at 677-78. Therefore, contrary to Claimant's argument that *Thomas* "dismantled" the Commissioner's arguments regarding generic job descriptions (Doc. 18 at 3 n.2), *Thomas* acknowledged that the Eighth Circuit often relies on the generic character of *DOT* job requirements to affirm ALJ decisions. *Thomas* was decided differently because the conflict between the RFC and the jobs relied upon by the ALJ was so readily apparent.

Finally, Claimant relies heavily on *Hutson*, in which the relevant portion of the claimant's RFC stated that the claimant could "understand, remember, and carry out simple instructions. He [can] sustain concentration and persist at simple tasks for two hours at a time, with normal breaks, for eight hours." 2020 WL 4220084, at *2 (alteration in original). *Hutson* found there was an apparent conflict in the vocational expert's testimony that the claimant would be limited to simple tasks, but then identified available occupations that would require the plaintiff have the capacity to carry out detailed but uninvolved written or oral instructions, i.e., reasoning level 2 jobs. *Id.* at *6. Similarly, *Hutson* found the ALJ's residual functional capacity determination limiting the claimant to jobs that only required him to understand, remember, and carry out simple instructions, and sustain concentration and persist at simple tasks was inconsistent with occupations that required the capacity to carry out detailed but uninvolved written or oral instructions. *Id.* For support, *Hutson* cites *Thomas* and *Stanton*, which I have already distinguished. In addition, *Hutson* quotes *Hulsey v. Astrue*, 622 F.3d 917, 923 (8th Cir. 2010) for the proposition that "[o]nly occupations with a

reasoning development level of one necessarily involve only simple instructions." *Id.* While that might be true, the cases previously discussed show that simple instructions are not the exclusive domain of occupations with reasoning level 1. *Hulsey* merely holds that reasoning level one jobs cannot have more than simple instructions.

Claimant urges the Court to follow the "*Hutson v. Saul* approach" and reverse the ALJ's decision. Claimant states that this is imperative and again cites the ALJ's statement that "the opinion that the claimant has marked findings in understanding and remembering detailed instructions and carrying out detailed instructions is not necessarily pertinent because the claimant is limited to simple, unskilled work." (Doc. 18 at 3 (citing AR at 23).) This statement has already been addressed. The ALJ assigned only partial weight to the opinions and specifically found that the conclusions related to Claimant's abilities to understand, remember, and carry out detailed instructions were not pertinent. More obviously, because *Hutson* is not binding on this Court, it is not "imperative" that the Court follow it as precedent. Claimant next argues that the Court must follow *Hutson* because substantial evidence does not support the ALJ's finding that she can perform reasoning level 2 and 3 jobs. This argument rests, as all others have on this issue, on the mistaken predicate that the ALJ adopted Dr. Brandon's one-to-two-step instruction limitation. However, as will be discussed below, I find that substantial evidence supports that Claimant can at least perform reasoning level 2 jobs.

The discussion above demonstrates that Claimant is able to perform reasoning level 2 jobs. Reasoning level 2 jobs are appropriate for claimants limited to "simple job instructions." *Moore*, 623 F.3d at 604. In addition reasoning level 2 jobs are appropriate for claimants whose RFCs contain a limit to simple work-related decisions. *See Gilbert,* 2019 WL 4751552, at *19. Guidance from the Social Security Administration provides that "[t]he basic mental demands of . . . unskilled work include the abilit[y] . . . to deal with changes in a routine work setting." SSR 85-15, at *4. I have thoroughly

evaluated the ALJ's decisions on Claimant's mental impairments and concluded those decisions are supported by substantial evidence on the record as a whole. The ALJ was only required to include in the RFC the impairments she found supported by the record. *See Lacroix,* 465 F.3d at 889. Two of the three jobs the ALJ relied on were reasoning level 2 jobs representing a total of 550,000 jobs.

The third job, mail sorter, was a reasoning level 3 job, which was also appropriate. Reasoning level 3 jobs require employees to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and d]eal with problems involving several concrete variables in or from standardized situations." *Dictionary of Occupational Titles*, App. C, https://www.oalj.dol.gov/PUBLIC/DOT/ REFERENCES/DOTAPPC.HTM. In *Welsh v. Colvin,* a claimant limited to simple, routine, repetitive work, an RFC that is arguably more limiting than Claimant's RFC, was found capable of doing reasoning level 3 work. 765 F.3d 926, 929-30 (8th Cir. 2014) (reiterating that "the *DOT* descriptions are maximum possible job requirements that [claimants] are not required to do all jobs in every category"). Furthermore, even if reasoning level 3 jobs are too complicated for Claimant, I find there are a significant number of reasoning level 2 jobs in the national economy cited by the ALJ without resort to the mail sorter job. *See Weiler v. Apfel*, 179 F.3d 1107, 1110-11 (8th Cir. 1999) (32,000 jobs significant number of jobs).

I recommend the District Court affirm the ALJ's decision on this issue.

## IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm** the decision of the ALJ.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must

specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **DONE AND ENTERED** this 2nd day of September, 2021.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa